Filed 2/4/25  Big Washington v. Fry CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| BIG WASHINGTON, LLC,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>THOMAS H. FRY, as Trustee, etc., et al.,<br><br>Defendants and Respondents. | F085743<br><br>(Super. Ct. No. BCV17-102341)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Bernard C. Barmann, Jr., Judge.

Law Office of Richard Jacobs and Richard Jacobs for Plaintiff and Appellant.

Alexander & Associates, William L. Alexander and Elizabeth Estrada, for Defendants and Respondents.

-ooOoo-

Plaintiff and appellant Big Washington, LLC (BW) is the owner of 36 acres of commercial real property improved with 18 warehouses (subject property) that it purchased from third-party Calcot, Ltd. (Calcot) in 2017.  As part of the transaction, BW received an assignment of Calcot's claims against the prior lessees of eight of those

warehouses (subject warehouses), i.e., defendants and respondents Thomas H. Fry and Ruth M. Fry, as Trustees of the T & R Fry Family Trust (Fry trust) (collectively, Fry).

Fry used the warehouses to store plastic intended for recycling. In late 2015, Calcot obtained an unlawful detainer judgment against Fry for possession only of the subject warehouses. After BW purchased the subject property, it brought suit against Fry, contending Fry was required to, but did not, remove 40,000 tons of plastic stored in the subject warehouses after Fry's lease was terminated. As Calcot's assignee, BW sued Fry for breach of the lease between Fry and Calcot and breach of the related covenant of good faith and fair dealing (together, contract causes of action). BW also sued Fry for trespass and nuisance.

The trial court granted summary adjudication of the contract causes of action in Fry's favor and the matter went to trial on the trespass and nuisance claims. A jury found in Fry's favor on those claims, and judgment was rendered against BW. BW appeals.

We affirm the judgment in its entirety.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     Trial Evidence

The factual discussion that follows is developed from evidence introduced during the trial of BW's causes of action for trespass and nuisance.

#### A.     *The Fry/Calcot Lease*

In 2011, Fry leased two of Calcot's warehouses. The lease term was three months, commencing in October of 2011, "and continuing thereafter until terminated[.]" Per the lease, Fry was to "use the Premises for temporary storage of polyethylene material," a type of plastic (the "plastic"). The plastic was owned by Maintenance Services, Inc. (MSI), a corporation wholly owned by Fry. In 2013, Fry and Calcot entered into an amendment of the lease. (The lease, as amended, is hereafter referred to as the "Fry/Calcot lease.") The amendment increased the number of warehouses leased by Fry to eight.

2.

## B. Third-Party Benhong Seeks to Purchase All or Part of the Subject Property and the Plastic

In late 2014, Calcot began negotiating with Roger Liang of Benhong (America) Recycling Co. Ltd. (collectively, Benhong)[1] for the sale and purchase of either all, or a portion, of the subject property, contingent upon Benhong also purchasing the plastic stored in the subject warehouses.

Calcot's president and chief executive officer (CEO), Jarral Neeper, testified Calcot wanted $6 million for the subject property. Liang had expressed his desire that Calcot finance Benhong's purchase of the property. After months of negotiations, Neeper wrote Liang and stated, in part, "you have become our friend here at Calcot" and "[Calcot's board of directors] ha[s] given me very specific instructions that they do not wish to be in the banking business and just wish to sell the property outright and are willing to take the price down to $3 million …. [¶] If you do not wish or are unable to raise the money, I need to start the process of getting the plastic moved out." Eventually, the parties' negotiations centered around the purchase and sale of approximately 11 acres of the subject property (the "11 acres") on which five of the subject warehouses were located.

Negotiations between Calcot and Benhong stalled and resumed twice during 2014 and 2015. Calcot enlisted Fry's assistance in moving the deal forward. On April 7, 2015, Calcot's treasurer returned Fry's April rent check along with a letter that read, "Calcot is returning the enclosed check as a result of an agreement reached by Calcot and John Richardson[,]" general manager of the company that managed the Fry trust and an officer of MSI. The letter continued, "Calcot and … Richardson have agreed that, in exchange for assistance that the Fry Trust will provide to [Benhong] in [its] efforts to obtain

---

[1] Benhong was named as a defendant in BW's complaint but was subsequently dismissed without prejudice.

3.

government approvals needed to establish a plastics recycling business at Calcot's property, the Fry Trust will not be required to pay rent for April and May 2015. Monthly rent payments shall resume on June 1."

Richardson testified the free rent was offered to "help Benhong with the engineering and design of their plastic [recycling] plant and how it would fit on Calcot's property." He said Calcot deferred the rent on more than one occasion during the Calcot/Benhong negotiations in exchange for Fry's assistance.

### C.    *Benhong and Fry Agree on the Purchase and Sale of the Plastic*

On July 10, 2015, the Fry trust, MSI, Benhong, and Benhong's corporate owner entered into an agreement for the purchase and sale of the plastic ("Benhong/Fry plastic PSA") by which Benhong agreed to buy the plastic for $700,000. A recital in the PSA acknowledged a Benhong-related company[2] was in the process of finalizing negotiations with Calcot to acquire the subject property but stated the sale of the plastic was *not* contingent upon the purchase and sale of the subject property. Richardson testified he discussed the sale with Neeper, Neeper consented to the sale, and Calcot's chief financial officer "was sitting in the room" when the plastic sale was negotiated.

### D.    *Calcot and Benhong Agree on the Purchase and Sale of the 11 Acres, and Calcot Terminates the Fry/Calcot Lease*

On or about December 8, 2015, Calcot and Benhong entered into a non-binding letter of intent ("Benhong LOI") for the purchase and sale of the 11 acres. It contained the following contingencies: "[Benhong] to sign a purchase agreement with … Fry … to purchase all of the … plastic …." and "[Benhong] and [Calcot] to sign a lease" for the three subject warehouses located outside the 11 acres.

---

[2] To avoid unnecessary complexity, we sometimes refer to Benhong's parent company, Benhong-related companies, and Liang collectively as "Benhong."

4.

On December 11, 2015, Calcot obtained an unlawful detainer judgment ("UD judgment") against Fry for possession of the subject warehouses. The UD judgment declared the Fry/Calcot lease forfeited. No other relief was sought or obtained. Richardson testified he did not know in December of 2015 that Fry had lost its right of possession of the subject warehouse and did not learn of the UD judgment until April or May of 2016.

On December 29, 2015, Calcot and Benhong entered into a purchase and sale agreement for the 11 acres (Benhong/Calcot PSA) and Benhong made a $50,000 downpayment. The Benhong/Calcot PSA acknowledged the subject warehouses were filled with plastic, and provided Benhong would "take possession of and title to the [11 acres] subject to the presence" of the plastic. In the PSA, Calcot represented it had previously terminated the Fry/Calcot lease and was in the process of evicting Fry. Calcot's obligation to perform under the PSA was conditioned upon Benhong (a) first purchasing all plastic located on the subject property, and (b) executing a lease for the three subject warehouses to be retained by Calcot.

### E.     *Benhong and Fry Amend the Benhong/Fry Plastic PSA*

On December 30, 2015, one day after the Benhong/Calcot PSA was entered into, Fry and Benhong executed an amendment to the Benhong/Fry plastic PSA, which reduced the sale price of the plastic to $350,000. Richardson testified the amendment was negotiated in Calcot's conference room in the presence of Calcot's real estate brokers, Steven Haupt and Dale Scales, just a few weeks prior to its execution. When Neeper was asked whether he approved Benhong "taking over as the so-called owner of the plastic," Neeper responded, "Well, we entered into a purchase agreement"—presumably, a reference to the Benhong/Calcot PSA.

5.

**_F._** **_Fry Pays Rent Through 2015 and, After the Benhong/Fry Plastic PSA is Completed, Fry Makes a January 2016 Rental Payment on Benhong's Behalf_**

After Calcot agreed to forgive Fry's April and May 2015 rental payments, Fry made rental payments of $10,000 per month to Calcot for the remainder of 2015 (i.e., June through December of 2015).

Neeper testified he was of the opinion rent should continue to be paid after entry of the UD judgment and for as long as plastic remained on the subject property. He testified, "Somebody needed to pay the monthly rent, and I didn't know if that was going to be [Benhong] or the Frys." Neeper said Calcot did not try to remove Fry from the property following entry of the UD judgment because "there was a deal ongoing with [Benhong] whereby Calcot [was] going to sell the property, and there [was] a belief that [Benhong] was going to purchase the plastic[]."

On January 11, 2016, Calcot's corporate attorney emailed Fry's attorney, as follows: "Richardson recently contacted … Neeper and inquired as to whether monthly rental payments should continue. Calcot wishes to maintain the status quo, and the monthly payments should continue. [¶] We understand [Benhong] intends to purchase the [plastic]. Are your client and [Benhong] nearing completion of that transaction?"

On January 13, 2016, Fry's attorney responded: "[Benhong] has completed the purchase of the [plastic], paid the purchase price, and is now the owner. [Benhong] is sending January rent to [Fry], and [Fry] will make the January rent payment per your response to me. Thereafter, [Benhong] will be making the rental payments. [¶] What is your ETA for closing [Benhong's] land purchase? Please let me know."

Calcot's attorney responded that same day. He did not object to Fry making the rental payment on Benhong's behalf. He informed Fry's attorney that the deadline to close the Benhong/Calcot PSA was mid-May of 2016, that Benhong is purchasing the 11 acres (with five subject warehouses) and will lease the remaining three subject warehouses to allow Benhong to remove the plastic therein, and that "[t]he damage to the

6.

leased warehouses caused by [Fry] remains an open issue, especially with respect to the three warehouses that Calcot will continue to own."

Richardson testified Benhong paid for the plastic in full on January 6, 2016, and paid Fry an additional $10,000 with the understanding Fry would make a rental payment for January 2016 on Benhong's behalf. Richardson testified he personally gave Neeper the check, drawn on Fry's account, for Benhong's January 2016 rent; that Neeper did not object or refuse the payment; and that Neeper never told him Fry had no right to make payment on Benhong's behalf. He testified that, after he provided the January 2016 rent payment to Neeper, he never received an invoice for subsequent rent from Calcot and heard nothing further from Calcot until he received the notice of abandonment.

Neeper did not recall receiving the check from Richardson but said he could not deny it occurred. When Neeper was asked whether he remembered "agree[ing] to rent space to [Benhong] for $2,000 per month per building in about December of 2015," Neeper responded, "[t]hat sounds about right, yes."

### G.     *Benhong Fails to Close on the Benhong/Calcot PSA and Calcot Notifies Benhong and Fry It Will Conduct a Public Sale of the Plastic Unless It Is Reclaimed*

Benhong failed to complete its purchase of the 11 acres. Neeper was informed Benhong "elected not to move forward with the purchase … because … construction costs … were far in excess of what [it] expected." According to Neeper, the transaction failed because Benhong "couldn't come up with the money" and wanted Calcot to finance the purchase which it was unwilling to do.

On May 11, 2016, Calcot's attorneys sent a "Notice of Right to Reclaim Abandoned Property" (unnecessary capitalization omitted) (notice of abandonment) pursuant to Civil Code sections 1993.03 through 1993.05[3] to both Fry and Benhong to

---

[3] Civil Code section 1993.03 provides, in part: "If property remains on the premises after a tenancy has terminated and the premises have been vacated by the tenant, the landlord shall give written notice to the tenant and to any other person the

7.

reclaim the plastic. The notice of abandonment included the following advisement: "Unless you pay the reasonable storage costs for the Plastics incurred to date, and take possession through removal of the Plastics from the Warehouses no later than May 31, 2016, the Plastics will be disposed of pursuant to Civil Code section 1993.07.[4] Specifically, the Plastics will be sold at a public sale after notice of the sale has been given by publication. You have the right to bid on the property at this sale. After the property is sold and the cost of storage, advertising, and sale is deducted, the remaining money will be paid over to Kern County and you may claim the remaining money at any time within one (1) year after the county receives the money."

Neeper testified that, on or about May 16, 2016, Benhong proposed entering into a new lease with Calcot but Calcot was interested only in selling the property since it was looking to consolidate its holdings.

Calcot never conducted a public sale of the plastic.

**H.      BW Purchases the Subject Property and Receives an Assignment of Calcot's Claims Against Fry and Benhong With Regard to the Plastic**

After Benhong failed to close on the Benhong/Calcot PSA, Calcot entered into negotiations with BW for the purchase and sale of the subject property. On October 27, 2016, BW (through its sole member/owner, Stephanie Smith),[5] made a written offer to

---

landlord reasonably believes to be the owner of the property…." (Civ. Code, § 1993.03, subd. (a).) Former Civil Code section 1993.04 (Stats. 2009, ch. 140, § 32), in effect during 2016, and Civil Code section 1993.05, provided sample notices that would comply with Civil Code section 1993.03.

[4] Former Civil Code section 1993.07, in effect during 2016, provided, in part: "(a)(1) The property described in the notice … shall be sold at public sale by competitive bidding except that, if the landlord reasonably believes that the total resale value of the property is less than the threshold amount, the landlord may retain the property for his or her own use or dispose of it in any manner." (Former Civ. Code, § 1993.07, subd. (a)(1), (2) (Stats. 2009, ch.140, § 34).)

[5] To avoid unnecessary complexity, we sometimes refer to BW, Stephanie Smith, her partner Craig Smith, Industrial Partners Group (a partnership between Stephanie

8.

purchase the subject property in its entirety for the sum of $3 million. The offer included a representation that BW was aware of the plastic on the property and that it would "take responsibility for the disposal of this plastic from the Property."

Calcot's real estate broker proposed an addendum to BW's offer by which the parties would acknowledge that Calcot received the UD judgment, that Calcot anticipated conducting a public sale of the plastic, and that if no bids were received Calcot would become the owner of the plastic and would convey ownership and possession of the plastic to BW. BW rejected the proposed addendum but suggested alternative provisions that eventually became part of their agreement.

On or about November 27, 2016, BW and Calcot executed a written agreement for the purchase and sale of the subject property ("BW/Calcot PSA"). In it, BW acknowledged Fry had left plastic in the warehouses previously leased by Fry, the plastic was not owned by Calcot, and the plastic was not being conveyed to BW. Instead, Calcot assigned all of its "legal rights, if any" to BW "to pursue any legal claims against third parties relating to the Plastic."

BW's Chief Operating Officer, Ben Eilenberg, testified that while BW was in escrow to purchase the subject property, Benhong threatened to sue BW, Calcot and Fry, and to record a lis pendens against the subject property, claiming it still had a right to purchase the 11 acres. Ultimately, Benhong never recorded a lis pendens against the property.

On or about October 4, 2017, escrow closed on the BW/Calcot PSA and BW became the owner of the subject property.

---

Smith and Craig Smith), and their respective representatives and attorneys, collectively as "BW."

9.

## II. Procedural Background

### A. The Complaint

On October 6, 2017, BW filed its complaint against Fry and Benhong. Benhong was subsequently dismissed from the case without prejudice. As mentioned, BW alleged the two contract causes of action and causes of action for trespass and nuisance against Fry.

### B. Summary Judgment and Summary Adjudication Motions At Issue

On April 26, 2019, Fry filed a motion for summary judgment or, alternatively summary adjudication of each of BW's four causes of action. The motion was made on grounds "there [were] no material facts in dispute and [BW] [could not] meet all required elements to prove" any of the causes of action. The motion was denied.

On October 26, 2021, Fry filed a second motion for summary judgment or, alternatively, summary adjudication of each of BW's four causes of action. In it, Fry contended the contract causes of action were each barred by the affirmative defenses of consent, waiver, excuse of performance, forfeiture, novation, and impracticability. Fry contended the causes of action for trespass and nuisance were barred by the affirmative defenses of consent and waiver. The trial court denied the motion.

On February 8, 2022, Fry filed a third motion for summary adjudication on the "issue of whether … Fry … owed any duty to remove plastics from the premises after January 13, 2016." The trial court granted the motion as to the contract causes of action but denied it as to the trespass and nuisance causes of action. In so ruling, the court said, "the unlawful detainer judgment essentially terminated or forfeited the [Fry/Calcot] lease" and Fry established "they did not have a duty under the forfeited lease to remove the plastic."

### C. The Trial of BW's Causes of Action for Trespass and Nuisance

On December 12, 2022, the matter went to trial before a jury on BW's causes of action for trespass and nuisance. On December 28, 2022, the jury reached a special

10.

verdict in favor of Fry and against BW. The jury was asked the following special verdict questions, and gave the following answers:[6]

"1. Did [BW] … own the property?" The jury answered, "YES." "2. Did [BW] receive an assignment from Calcot of Calcot's claims against Thomas H. Fry and Ruth M. Fry, Trustees of the T&R Fry Family Trust (referred to as the 'Frys')?" Again, the jury responded, "YES." "3. Did The Frys own the plastic on the property after January 13, 2016?" The jury answered, "NO." "4. Did The Frys, intentionally leave the plastic on the property after January 13, 2016?" Again, the jury answered, "NO." "5. Did Calcot give permission to The Frys to keep the plastic on its property from December 12, 2015 through January 13, 2016?" The jury responded, "YES." "6. In and after January 2016, did Calcot give permission to Benhong … to keep the plastic on its property?" Again, the jury responded, "YES." The jury was then instructed to skip questions seven through 10. "11. What is the amount, if any, of [BW's] damages for trespass?" The jury responded "$ 0." "12. Did The Frys, by failing to remove the plastic, permit a condition to exist that was harmful to health, indecent or offensive to the senses, an obstruction of the free use of property, so as to interfere with the comfortable enjoyment of life or property, or a fire hazard or other potentially dangerous condition to real property?" The jury answered, "NO." The jury was then instructed to skip the remaining questions.

### D.    *Judgment Is Entered, and BW Appeals*

On December 30, 2022, the trial court entered judgment in favor of Fry and against BW on all causes of action. Notice of entry of judgment was served on January 5, 2023.

---

[6] All special verdict questions submitted to the jury were in bold type. We have omitted the bold type in quoting the special verdict.

On February 17, 2023, BW timely filed a notice of appeal of the judgment. On February 22, 2023, BW timely amended its notice of appeal to include an appeal of the order granting, in part, Fry's motion for summary adjudication.[7]

## DISCUSSION

### I.    BW's Contentions on Appeal

BW contends the trial court erred (1) by considering Fry's third motion for summary adjudication in violation of Code of Civil Procedure sections 437c, subdivision (f)(2), and 1008, which "prohibit a party from making renewed motions not based on new facts or law[.]"[8] (*Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1096 (*Le Francois*), italics omitted.); (2) by partially granting Fry's third motion upon the theory Fry owed no duty to Calcot to remove the plastic from the subject warehouses; (3) by allowing argument at trial that, following the sale of the plastic to Benhong, Fry was absolved from any requirement to remove the plastic; (4) by showing favoritism to Fry in front of the jury; (5) by making erroneous evidentiary rulings; and (6) by not performing a thorough consent analysis in the special verdict form. We first address contentions that relate to matters tried to the jury.

### II.    Consent Analysis in Special Verdict Form

BW argues the trial court erred in posing the following special verdict question to the jury, without follow up questions: "In and after January 2016, did Calcot give permission to Benhong … to keep the plastic on its property." BW contends the question "was too broad and designed to bring about a defense verdict even outside of the appropriate application of the law." BW acknowledges the jury could have permissibly

---

[7] On February 23, 2023, the trial court entered an amended judgment to add an award of costs and attorney fees. BW's appeal encompasses the amended award. (*R.P. Richards, Inc. v. Chartered Const. Corp.* (2000) 83 Cal.App.4th 146, 158 [attorney fees]; *Grant v. List & Lathrop* (1992) 2 Cal.App.4th 993, 996–997 [costs].)

[8] All statutory references are to the Code of Civil Procedure unless otherwise noted.

12.

found Calcot consented to the "temporary storage of the plastic" while it negotiated with Fry and Benhong but argues Calcot "never gave consent for the plastic to remain on site permanently, or even indefinitely." BW contends the special verdict form should have included one or more questions designed to determine whether the consent it gave Benhong ended.[9]

### A.     Standard of Review

" 'We analyze the special verdict form de novo' as a matter of law." (*Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1242 (*Taylor*).) "A 'special verdict must present the conclusions of fact as established by the evidence, and not the evidence to prove them; and those conclusions of fact must be so presented as that nothing shall remain to the Court but to draw from them conclusions of law.' " (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 325.) In reviewing a special verdict, the appellate court " 'does not imply findings in favor of the prevailing party.' " (*Taylor*, at p. 1242.)

However, "[i]f the special verdict is not 'hopelessly ambiguous,' the court may interpret the verdict ' "from its language considered in connection with the pleadings, evidence and instructions," ' and counsel's argument to the jury." (*Fuller v. Department of Transportation* (2019) 38 Cal.App.5th 1034, 1038.) "[I]n construing an ambiguous verdict the court may use anything in the proceeding that serves to show with some certainty what the jury intended and for this purpose reference may be had, for example, to the pleadings, the evidence, the admissions of the parties, the instructions, and the forms of verdict submitted." (*West v. Duncan* (1962) 205 Cal.App.2d 140, 143.) Moreover, "a defective special verdict form is subject to harmless error analysis." (*Taylor*, *supra,* 222 Cal.App.4th at p. 1244.) " 'If …, under the pleadings and evidence

---

[9] BW made this argument to the trial court prior to jury deliberations and, thus, preserved the issue for appeal.

the same result would have been reached even if the error had not been committed, there is no miscarriage of justice.' " (*Id.*, at p. 1245.)

### B.     Analysis

The trial court instructed the jury that to establish trespass, BW must prove each of the following:[10] "1, that [BW], or … Calcot, owned, leased, occupied, and/or controlled the property.  [¶] 2, that [Fry] intentionally or, although not intending to do so, recklessly or negligently entered [BW's] or … Calcot's property or intentionally, although not intending to do so, recklessly or negligently caused the 80 million pounds of plastic to enter [BW], or … Calcot's property.  [¶] 3, that [BW], or … Calcot, did not give permission for the entry or that [Fry] exceeded [BW], or …, Calcot's permission.  [¶] 4, that [BW], or … Calcot, was actually harmed.  [¶] And, 5, that [Fry's] entry or conduct was a substantial factor in causing [BW], or … Calcot's harm."

The trial court instructed the jury that to establish the nuisance claim, BW must prove each of the following: "1, that [BW], or … Calcot, owned, leased, occupied or controlled the property.  [¶] 2, that [Fry], by acting or failing to act, created a condition or permitted a condition to exist that was harmful to health or was indecent or offensive to the senses or was an obstruction to the free use of property so as to interfere with the comfortable enjoyment of life or property or was a fire hazard or other potentially dangerous condition to [BW], or …, Calcot's property.  [¶] 3, that [Fry's] conduct in acting or failing to act was intentional or unreasonable or unintentional, but negligent or reckless, or the condition that [Fry] created or permitted to exist was the result of an abnormally dangerous activity.  [¶] 4, that this condition substantially interfered with [BW], or …, Calcot's use or enjoyment of its land.  [¶] 5, that an ordinary person would reasonably be annoyed or disturbed by [Fry's] conduct.  [¶] 6, that [BW], or …, Calcot,

---

[10] The parties raise no issue concerning the jury instructions given by the trial court.

14.

did not consent to [Fry's] conduct. [¶] 7, that [BW] was harmed. [¶] 8, that [Fry's] conduct was a substantial factor in causing [BW's] harm. [¶] And, 9, that the seriousness of the harm outweighs the public benefit of [Fry's] conduct."

The jury answered several special verdict questions in addition to the one that forms the basis of BW's challenge. In particular, the jury found Calcot gave Fry permission to keep the plastic on the subject property for the period December 12, 2015, through January 13, 2016. The jury determined Fry did not own the plastic after January 13, 2016. It also found that, in and after January 2016, Calcot gave Benhong permission to keep the plastic on its property. And, the jury found Fry did not "intentionally leave the plastic on the property after January 13, 2016."

We first consider the import of the jury's finding that Fry did not own the plastic after January 13, 2016. The only evidence in the record that Fry had divested itself of ownership of the plastic is the evidence showing Fry entered into and consummated the Benhong/Fry plastic PSA—an express condition of the Benhong/Calcot LOI and PSA. The jury's finding that Fry no longer owned the plastic after January 13, 2016, could only mean the jury determined Benhong owned the plastic after January 13, 2016, as a result of consummating the Benhong/Fry plastic PSA. Similarly, because the evidence is undisputed that the plastic remained on-site, the jury's finding that Fry did not intentionally leave the plastic on the subject property, coupled with its finding that Calcot gave Benhong permission to keep the plastic on-site, could only mean the jury determined it was Benhong, not Fry, that left the plastic on-site.

The uncontradicted evidence shows the Fry/Calcot lease had been forfeited as a result of the UD judgment; that Calcot was informed, as of January 13, 2016, that Benhong had completed the plastic purchase and had taken ownership of the plastic; that Calcot was informed Benhong would be making the January 2016 rent payment as well as any future rent payments (the first payment of which would be through Fry as an intermediary); that, after being so informed, Calcot accepted the January 2016 rent

15.

payment without objection; that Calcot never sought rent payments from Fry thereafter; that Calcot intended and required Benhong purchase the plastic during the Benhong/Calcot PSA due diligence period in order to complete the purchase and sale of the 11 acres; that Fry was no longer in possession of the subject warehouses or the plastic since in or around January of 2016; and that BW admitted Benhong was in possession of the subject warehouses in or around January 2016 "for a short period, but [did] not continue[] its *tenancy*" (italics added). When the jury found Calcot gave Benhong permission to keep the plastic on its property, in and after January 2016, the jury undoubtedly concluded Calcot was dealing with Benhong, not Fry, concerning the plastic.

Notably, Fry had Calcot's consent to keep the plastic on the subject property during the entirety of Fry's ownership of the plastic and its tenancy and possession of the subject warehouses. Fry paid for that privilege. After Fry sold the plastic to Benhong and no longer had possession of the warehouses, Calcot gave Benhong permission to keep the plastic on the subject property and accepted rent on Benhong's behalf because it was in the midst of consummating the Benhong/Calcot PSA. Thereafter, Benhong and Calcot continued moving toward closing the Benhong/Calcot PSA and it was not until February 2016 that the deal fell through.

BW provides no compelling argument to demonstrate how Fry could have asserted any right to enter the subject property or reclaim the plastic in violation of Benhong's (albeit brief) tenancy and ownership of the plastic, or in violation of Calcot's rights as a landlord to rent the property to Benhong. Even if Calcot had subsequently revoked the consent it gave to Benhong to continue storing the plastic on the subject property, any damages suffered would have been incurred *after* Fry's tenancy under the Fry/Calcot lease and holdover tenancy had ended. BW provides no compelling argument to demonstrate how under those circumstances an obligation on Fry's part to remove the plastic could spring back into existence.

16.

We conclude the trial court did not err in failing to include additional questions on the special verdict form concerning any subsequent revocation of the consent given to Benhong.  Moreover, we are unable to conclude that there is a reasonable chance BW would have obtained a more favorable result at trial even if the additional questions it argues for were included on the special verdict form.  (See *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800 (*Cassim*) [harmless error standard for state law claims].)  Consequently, no prejudicial error has been shown.

## III.    **Evidentiary Rulings**

BW contends the trial court erred through various evidentiary rulings. " 'We apply the abuse of discretion standard when reviewing the trial court's rulings on evidentiary objections.' [Citation.]  An 'erroneous evidentiary ruling requires reversal only if "there is a reasonable probability that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*Daimler Trucks North America LLC v. Superior Court* (2022) 80 Cal.App.5th 946, 960.)  For reasons discussed below, we conclude BW has waived each of these contentions of error and find no prejudicial error under the applicable standard of review.

### A.    *Requiring the Smiths' In-Person Testimony*

BW contends the trial court violated several statutes by requiring the Smiths to testify in-person, "despite the fact that they are Florida residents."  BW makes no argument to demonstrate it would have received a more favorable decision had the court not required their in-person testimony.  Absent such an argument, we fail to appreciate how requiring the Smiths to testify in person adversely affected jury deliberations.  "The absence of cogent legal argument or citation to authority allows this court to treat the contention[] as waived." (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830 (*Falcone*).)  Accordingly, we deem the argument waived.

### B. Allowing Richardson to Remain In the Court Prior to His Testimony

BW contends it was error for the trial court to allow Richardson to remain in court during trial. BW argues, "[t]his allowed [Fry's] primary witness, who was not a party, to observe all prior testimony before he testified."

BW raised the issue with the trial court prior to the presentation of evidence. In response, Fry's counsel told the judge Richardson "is the general manager of the Frys" and was going to be the party's representative participating in the trial. BW's counsel argued the Frys were being sued individually and are not allowed to have party representatives. Fry's counsel reiterated, "He's the general manager of the trust. He negotiates and executes contracts. He basically does everything on behalf of the trust." The trial court concluded Richardson "would qualify as the one permitted party representative."

" 'In order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record.' " (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153 (*Malibu Hillbillies*).) BW has failed to provide this court with any legal authority upon which to base a ruling and, as a consequence, it has waived its contention of error. (*Ibid.*; *Falcone*, *supra*, 164 Cal.App.4th at p. 830.) Moreover, we find no error.

Evidence Code section 777 provides: "(a) Subject to subdivisions (b) and (c), the court may exclude from the courtroom any witness not at the time under examination so that such witness cannot hear the testimony of other witnesses. [¶] (b) A party to the action cannot be excluded under this section. [¶] (c) If a person other than a natural person is a party to the action, an officer or employee designated by its attorney is entitled to be present." (Evid. Code, § 777.)

Fry's counsel represented to the court that Richardson was the general manager of the Fry trust and was responsible for making all decisions for the Fry trust. The evidence elicited at trial largely corroborated this information. Mr. Fry was 81 years of age and in

a hospital at the time of trial.  He testified via Zoom that Richardson was his "right-hand man" and deferred nearly every question posed to him regarding matters relevant to the litigation to Richardson.  As for Mrs. Fry, the evidence is undisputed she had no involvement in the matters at issue.  Under such circumstances, we find no abuse of discretion in allowing Richardson to remain in the courtroom prior to his testimony.

### C.  *Not Allowing Calcot and BW Executives to Testify Concerning the Damages and Removal Cost of the Plastic*

BW contends the trial court erred by not allowing Neeper and Eilenberg to testify as to the damages and removal cost of the plastic.  BW contends the testimony was "lay opinion testimony that was allowed under California Evidence Code [s]ection 800."

BW cites to numerous pages within the reporter's transcript where questions or answers directly or indirectly related to the cost of removing the plastic were objected to and sustained on various grounds.[11]  BW does not address *any* of these alternative grounds, or *any* specific question asked or answered, and provides no legal argument or analysis other than to offer a conclusory statement the testimony was "lay opinion testimony that was allowed under California Evidence Code [S]ection 800."  We conclude BW has waived this contended error.  (*Falcone*, *supra*, 164 Cal.App.4th at p. 830; *Malibu Hillbillies*, *supra*, 36 Cal.App.5th at p. 153.)

In any event, any such asserted error would be harmless.  BW elicited testimony from Eilenberg that BW had obtained a bid to remove the plastic for $2.5 million and two years of free rent valued at an additional $2.5 million.  BW also elicited testimony from Neeper that he received an estimate of approximately $2.8 million to remove the plastic.

---

[11] The objections raised were on grounds the question or answer lacked foundation, called for speculation, called for expert opinion, called for hearsay, called for a legal opinion, was argumentative, was precluded by motions in limine, and was non-responsive.

19.

Despite Fry having pointed to this testimony in its respondents' brief, BW failed to address this information in its reply brief.

### D. *Excluding Evidence of a Consent Decree*

BW contends the trial court erred in granting a motion in limine to exclude evidence of a consent decree between Fry and MSI, on one hand, and the Los Angeles Waterkeeper, on the other hand. The court excluded the consent decree under Evidence Code section 352, which gives the court discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will … create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

BW contends, without discussion or analysis, that the consent decree demonstrates Fry's "conduct in abandoning 80,000,000 pounds of agricultural plastic waste was purposeful rather than a mistake or inadvertent under Evidence Code [s]ection 1101(b)." BW does not explain what it means by this contention. BW does not discuss *any* provisions of the consent decree in its appellate brief to demonstrate a logical connection between the consent decree and the instant case, and has failed to provide this court with any cogent legal argument to demonstrate the consent decree's relevance. We are "not required to examine undeveloped claims, nor to make arguments for parties." (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 (*Paterno*).) We conclude BW has waived its contention. (*Malibu Hillbillies*, *supra*, 36 Cal.App.5th at p. 153; *Falcone*, *supra*, 164 Cal.App.4th at p. 830.)

Notably, the consent decree states that nothing in it "shall constitute or be construed as a finding, adjudication, admission, or acknowledgement of any fact, law or liability, nor shall it be construed as an admission of violation of any law, rule, or regulation." The trial court did not abuse its discretion in finding the relevance of the decree, if any, was outweighed by the probability it would prejudice Fry.

20.

### E.    *Allowing Settlement Discussions Into Evidence*

BW also argues the trial court erred in allowing evidence of settlement discussions between BW and Benhong, and BW and Calcot, into evidence and contends (without further argument or analysis, or discussion of the alleged settlement or the evidence at issue) that the evidence violated Evidence Code sections 1152 and 1154.

Evidence Code section 1152 provides, in relevant part:  "Evidence that a person has, in compromise or from humanitarian motives, furnished or offered or promised to furnish money or any other thing, act, or service to another who has sustained or will sustain or claims that he or she has sustained or will sustain loss or damage, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove his or her liability for the loss or damage or any part of it."  (Evid. Code, § 1152, subd. (a).)  Evidence Code section 1154 provides:  "Evidence that a person has accepted or offered or promised to accept a sum of money or any other thing, act, or service in satisfaction of a claim, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove the invalidity of the claim or any part of it."

Although BW does not discuss the evidence at issue or analyze it to demonstrate it fell within the protections of Evidence Code sections 1152 or 1154, it did provide citations to the reporter's transcript for the evidence it is challenging, which we now comment upon.  The evidence and our comments are, as follows:  (1) Eilenberg's testimony that (a) BW, *prior to purchasing the subject property*, had discussions with *Benhong* concerning Benhong potentially leasing the property from BW.  There is no showing that this was done in an effort to resolve pending or anticipated litigation or claims or that it was admitted for the purpose of proving liability on the part of Benhong, BW, or any party to the lawsuit; (b) BW, after its purchase of the subject property, offered *Benhong* an opportunity to remove the plastic.  Again, BW has not shown this was done to resolve pending or anticipated litigation or claims, or that it was admitted for the purpose of demonstrating liability; (c) BW's statement to Calcot that they would take

21.

full responsibility for the plastic if it remained on the property and that this should present no concern for Calcot. This statement was made during transactional negotiations between BW and Calcot. There was no showing of any pending or anticipated litigation or claims between BW and Calcot; and (2) Neeper was shown an email that BW claimed was part of settlement negotiations. The record does not identify the email that was shown to Neeper but it does reveal *the email was not shown to the jury and its contents were not discussed or otherwise disclosed to the jury*. BW has not shown any abuse of discretion on the part of the trial court, and has not demonstrated it was harmed by the evidence.

As previously alluded to, BW makes no argument to show it was harmed by admission of the evidence. "Prejudice from error is never presumed but must be affirmatively demonstrated by the appellant." (*Paige v. Safeway, Inc.* (2022) 74 Cal.App.5th 1108, 1127.) We are "not required to examine undeveloped claims, nor to make arguments for parties." (*Paterno, supra,* 74 Cal.App.4th 68, 106.) These failures have (again) resulted in BW waiving its argument. (*Malibu Hillbillies*, *supra*, 36 Cal.App.5th at p. 153; *Falcone*, *supra*, 164 Cal.App.4th at p. 830.) No abuse of discretion has been shown.

## IV.    Claims of Favoritism Shown to Fry

BW contends the trial court showed favoritism to Fry, and disparaged BW and its counsel, in front of the jury by (1) requiring the Smiths to testify in-person while allowing the Frys to testify via Zoom; (2) not allowing Eilenberg or Neeper to testify concerning the removal cost of the plastic; and (3) allowing settlement discussions into evidence. BW contends these issues "significantly overlap" the issues discussed in the preceding section of this opinion but states, "the two do merit a separate analysis." Unfortunately, BW does not provide a separate analysis for these contentions—it merely

22.

cites to a judicial ethics opinion that generally requires judicial officers remain impartial and not exhibit favoritism to one party over another.[12]

With regard to Mr. and Mrs. Fry's testimony, we note the trial court was advised Mr. Fry was in the hospital at the time of trial, suffering from lung cancer, and had undergone chemotherapy and other serious medical treatments. Both Mr. and Mrs. Fry were in their 80s and Mrs. Fry was Mr. Fry's sole caregiver. No comparable showing was made to demonstrate the Smiths' inability to testify in person. The trial court found the Smiths were residents of the state of California for purposes of section 1989 and were obligated to testify in court. BW presents no argument or authority to demonstrate the court erred in requiring their in-person testimony. The rulings as to the Frys and the Smiths are not inconsistent as they are based on altogether different circumstances. They are not evidence of judicial misconduct. Moreover, related discussions between the court and counsel, and evidence taken during a related Evidence Code section 402 hearing, were all conducted outside the presence of the jury. We conclude the trial court was within its discretion to allow the Frys to testify by Zoom, and to deny a similar accommodation for the Smiths. BW's contention lacks merit.

As for the remaining contentions, the trial court's evidentiary rulings do not suggest partiality toward Fry over BW. BW makes no argument to demonstrate otherwise. No showing has been made that the court applied the rules of evidence (or any other rule or law) inconsistently or without an even hand. "The mere fact that the trial court issued rulings adverse to [a party] on several matters …, even assuming one or more of those rulings were erroneous, does not indicate an appearance of bias, much less demonstrate actual bias." (*Brown v. American Bicycle Group, LLC* (2014)

---

[12] CJEO Formal Opinion 2021–018 (Dec. 15, 2021) "Providing Feedback on Attorney Courtroom Performance," Cal. Sup. Ct. Comm. On Jud. Ethics Opinions., pp. 2, 8–9, 12.

224 Cal.App.4th 665, 674.) Consequently, these additional contentions are adequately addressed in the prior section of this opinion.

**V.     The Trial Court Did Not Err By Allowing Argument that the Benhong/Fry Plastic PSA Absolved Fry of Any Requirement to Remove the Plastic**

BW argues Fry had a duty to remove the plastic from the subject property and the trial court erred by allowing Fry to argue its sale of plastic to Benhong relieved it of that duty.  We start our analysis by noting we do not accept the premise of BW's argument.  As we discuss further below, Fry's defense in this matter was not based solely on the fact that it sold the plastic to Benhong.

"In conducting closing argument, attorneys for both sides have wide latitude to discuss the case.  ' " ' " "The right of counsel to discuss the merits of a case, both as to the law and facts, is very wide, and he has the right to state fully his views as to what the evidence shows, and as to the conclusions to be fairly drawn therefrom.  The adverse party cannot complain if the reasoning be faulty and the deductions illogical, as such matters are ultimately for the consideration of the jury." ' " ' " (*Cassim*, *supra*, 33 Cal.4th at p. 795.)  " ' "An attorney is permitted to argue all reasonable inferences from the evidence…." ' " (*Ibid*.)

BW points to the following facts in support of its argument:  the Fry/Calcot lease authorized use of the property for the "temporary" storage of plastic; the Fry/Calcot lease was not assignable; Calcot obtained the UD judgment against Fry; BW and Calcot were not parties to the Benhong/Fry plastic PSA; and BW has been unable to lease the subject warehouses due to the presence of the plastic.

Among other things, BW ignores evidence that (1) the Benhong/Calcot PSA (and LOI) were expressly conditioned upon Benhong first purchasing the plastic and executing a lease for the three subject warehouses that were not being purchased; (2) after Benhong completed the plastic purchase, Calcot wanted rent to continue and did not know, at first, whether it would come from Benhong or Fry; (3) Calcot accepted the January 2016 rent

24.

payment made on behalf of Benhong without objection; (4) after receiving the January 2016 rent payment, Calcot never again sought rent from Fry; (5) Calcot understood that after Benhong purchased the plastic, the plastic would remain on-site because Benhong intended to establish a plastic recycling facility on the 11 acres; and (6) no effort was made to dispose of the plastic while the Benhong/Calcot PSA remained pending. In our view, the evidence allowed for an argument Calcot approved of the sale of plastic to Benhong, acknowledged Benhong's ownership of the plastic, rented the subject warehouses to Benhong, and, allowed Benhong to store the plastic on-site as part of a Benhong tenancy.

Based on all of the foregoing, we will affirm the judgment with respect to the trespass and nuisance causes of action.

## VI. The Court Did Not Violate Sections 437c and 1008 or the Holding in *Le Francois*

BW contends the trial court erred by entertaining Fry's third motion for summary adjudication in violation of subdivision (f)(2) of section 437c and section 1008. For reasons discussed below, we disagree.

Subdivision (f)(2) of section 437c provides: "A motion for summary adjudication … shall proceed in all procedural respects as a motion for summary judgment. A party shall not move for summary judgment based on issues asserted in a prior motion for summary adjudication and denied by the court *unless that party establishes, to the satisfaction of the court, newly discovered facts or circumstances or a change of law supporting the issues reasserted* in the summary judgment motion." (Italics added.)

Section 1008 provides, in part: "A party who originally made an application for an order which was refused in whole or part … may make a subsequent application for the same order *upon new or different facts, circumstances, or law*, in which case it shall be shown by affidavit what application was made before, when and to what judge, what

25.

order or decisions were made, and what new or different facts, circumstances, or law are claimed to be shown." (§ 1008, subd. (b), italics added.) It further provides, in part: "This section specifies the court's jurisdiction with regard to applications for reconsideration of its orders and renewals of previous motions, and applies to all applications to reconsider any order of a judge or court, or for the renewal of a previous motion, whether the order deciding the previous matter or motion is interim or final. *No application to reconsider any order or for the renewal of a previous motion may be considered by any judge or court unless made according to this section.* (*Id.*, at subd. (e), italics added.)

In *Le Francois*, *supra*, 35 Cal.4th 1094, the plaintiffs appealed a judgment rendered after the trial court granted defendants' second motion for summary judgment. (*Id.*, at p. 1097.) The Court of Appeal found the "second motion was based on the same law and evidence as the first motion" and "violated sections 437c, subdivision (f)(2), and 1008," but concluded "the trial court had 'inherent power to rule upon the second motion[.]' " (*Ibid.*) The California Supreme Court disagreed. (*Id.*, at 1109.) In reversing the decision, the *Le Francois* court accepted the Court of Appeal's finding that the defendant's second motion for summary judgment "was based on the same law and evidence as the first motion," and then considered "whether the trial court had authority to consider, and then grant, the second … motion notwithstanding the provisions of sections 437c and 1008." (*Le Francois*, *supra*, 35 Cal.4th at p. 1099.) The high court held that "sections 437c, subdivision (f)(2), and 1008 prohibit a *party* from making renewed motions not based on new facts or law, but do not limit a *court's* ability to reconsider its previous interim orders on its own motion[.]" (*Id.*, at pp. 1096–1097.)

BW argues Fry's third motion for summary adjudication was duplicative of its second motion, and tantamount to a motion for reconsideration that did not comply with sections 437c, subdivision (f)(2) and 1008. In response, Fry argues each motion raised separate and distinct issues. Fry contends the first motion challenged BW's ability to

"establish each element of its four causes of action," the second motion sought to adjudicate Fry's affirmative defenses, and the third motion sought to adjudicate whether Fry "owed any duty to remove plastics from the premises after January 13, 2016."

We have compared Fry's prior motions with its third motion and conclude the third motion was a renewal of the prior motions and did not assert any new facts or change in the law. Fry's first motion was brought on grounds that included both an argument Fry had no obligation to remove the plastic under the terms of the Fry/Calcot lease, and an argument Calcot waived any such alleged obligation by accepting rent from Benhong and surrounding conduct. Fry's second motion was based on an argument those claims were barred by the affirmative defense of waiver and asserted similar facts bearing on waiver as it did in the first motion. Fry's third motion was based on an argument Fry owed no duty to remove the plastic because Calcot waived it by accepting Benhong's rent and surrounding conduct. Fry could not properly bring the third motion on these duplicative grounds absent the assertion of new facts or a change in the law. (§§ 437c, subd. (f)(2), 1008.)

In their reply brief in support of the third motion, Fry conceded the motion was "based on the same evidence as Fry's prior two motions." Moreover, the third motion was not based upon an intervening change in the law and Fry never filed an affidavit to show a change in the law or the existence of new facts. Based on the holding in *Le Francois*, we conclude the trial court was precluded from considering the motion *on the grounds asserted by Fry*.

However, the court's ruling was based on grounds other than those asserted by Fry in its third motion. Under these circumstances, we consider two cases to be instructive— *In re Marriage of Barthold* (2008) 158 Cal.App.4th 1301 (*Barthold*) and *Cox v. Bonni* (2018) 30 Cal.App.5th 287 (*Cox*).

In *Barthold*, a marital dissolution case, the trial court denied a post-judgment motion filed by the wife and the wife moved for reconsideration. (*Barthold*, *supra*,

27.

158 Cal.App.4th at p. 1303.) In opposition, the husband argued the reconsideration motion was not supported by new facts or, alternatively, any new facts asserted in the motion were previously known to the wife and should have been presented in connection with the original motion. (*Id.*, at p. 1306.) In ordering relief in favor of the wife, the court stated it had " 'missed the most important point' " in previously denying the post-judgment motion, and had revisited the husband's opposition to the prior motion. (*Id.*, at p. 1306.)

The *Barthold* court affirmed the trial court's order. (*Barthold*, *supra*, 158 Cal.App.4th at p. 1315.) The appellate court wrote, "*Le Francois* simply requires that the trial court reconsider a prior ruling *based on its own realization that the ruling was erroneous*, and not based upon a determination that the motion to reconsider should itself be granted on its merits." (*Id.*, at p. 1308, italics added.) "[I]n order to grant reconsideration on its own motion, the trial court must conclude that its earlier ruling was wrong, and change that ruling *based on the evidence originally submitted*. Thus, our ruling does not permit parties to obtain reconsideration relying on evidence that could and should have been, but was not, presented to the court in connection with the original motion." (*Id.*, at p. 1314, italics added.)

The *Barthold* court determined the trial court had not considered, and "did not rely on or even mention [the wife's] additional evidence." (*Barthold*, *supra*, 158 Cal.App.4th at p. 1309.) The *Barthold* court concluded that "in stating that [the wife's] motion for reconsideration was 'granted,' the [trial] court simply meant that it was providing the *relief* sought by the motion, and did not mean to say that it was granting the motion itself."[13] (*Id.*, at p. 1309.) The court concluded "the trial court's inherent authority to

---

[13] The *Barthold* court also noted the case before it "[did] not involve any possibility of forum shopping" since it was before the same judge that made the original ruling. (*Barthold*, *supra*, 158 Cal.App.4th at p. 1310.) The same is true here.

28.

correct its errors applies even when the trial court was prompted to reconsider its prior ruling by a motion filed in violation of section 1008." (*Id.* at pp. 1303–1304.)

In *Cox*, the trial court confirmed an arbitration award in favor of the defendant. (*Cox*, *supra*, 30 Cal.App.5th at p. 293.) The plaintiff successfully moved to vacate the award on grounds the arbitrator failed to make required disclosures, and the defendant moved for reconsideration. (*Ibid*.) The plaintiff opposed the reconsideration motion on grounds any alleged "new facts" in support of the motion were known, and could have been presented in connection with the earlier motion to vacate. (*Id.*, at p. 298.) At the hearing on reconsideration, the court permitted the arbitrator to argue in favor of the defendant's motion. (*Id.*, at pp. 299, 314.) The *Cox* court acknowledged, "[t]he trial court granted reconsideration based on the arbitrator's arguments and confirmed the award without further briefing or hearing." (*Id.*, at p. 293.)

Relying on *Barthold*, the *Cox* court wrote, "it is evident the trial court did not reconsider its order based on any of the purportedly new law or facts in defendant's motion, but on its own realization that its earlier order was in error, as permitted by *Le Francois*." (*Cox*, *supra*, 30 Cal.App.5th at pp. 312–313.) "In granting reconsideration, the trial court did not refer to the purportedly new evidence and law raised by defendant's motion, but only the arguments raised by the neutral arbitrator at the hearing on the motion." (*Id.*, at p. 313.) The *Cox* court wrote, "[a]lthough the trial court did not invoke its inherent authority expressly, in context, it was clear the trial court did so. The trial court did not grant defendant's motion on the merits, but only the relief sought by that motion." (*Id.*, at p. 314.)

Here, the situation is analogous to that in *Cox* and *Barthold*. Even though Fry's third motion for summary adjudication was based on the theory Calcot had *waived* any duty to remove plastic from the subject warehouses, the trial court appears to have ignored those facts and argument and, instead, based its decision on evidence and argument first submitted in connection with Fry's first motion for summary

29.

judgment/adjudication—namely that no provision in the Fry/Calcot lease required the removal of plastic and that, in any event, the lease had been terminated by virtue of the UD judgment.

We conclude the trial court's decision to summarily adjudicate the contract causes of action was, in effect, a reconsideration of its prior ruling in denying Fry's *first* motion for summary judgment/adjudication, and was made on its own motion. (See *Cox, supra*, 30 Cal.App.5th at p. 312; *Barthold, supra*, 158 Cal.App.4th at pp. 1303–1304.) "[S]ections 437c, subdivision (f)(2), and 1008 … do not limit a *court's* ability to reconsider its previous interim orders on its own motion[.]" (*Le Francois, supra*, 35 Cal.4th at pp. 1096–1097.) Thus, the court's ruling did not violate sections 437c, subdivision (f)(2), or 1008.

*Le Francois* is clear that "[t]o be fair to the parties, if the court is seriously concerned that one of its prior interim rulings might have been erroneous, and thus that it might want to reconsider that ruling on its own motion … it should inform the parties of this concern, solicit briefing, and hold a hearing." (*Le Francois, supra*, 35 Cal.4th at p. 1108.) Although this was not done, the Register of Actions reveals BW also brought a motion for summary judgment/adjudication, which was considered and heard at the same time as Fry's third motion for summary adjudication. The record on appeal does not contain BW's original moving papers but does contain Fry's opposition to the motion, Fry's response to BW's separate statement of undisputed material facts and statement of additional facts, and the trial court's order denying BW's motion. From this record, we can safely conclude BW's competing motion, as it related to the contract causes of action, was based on its contention that Fry was contractually obligated under the Fry/Calcot lease to remove the plastic.[14] Thus, the trial court had the benefit of briefing on the exact

_____

[14] It is possible, and perhaps likely, that the trial court was prompted to reconsider Fry's first motion as a result of its consideration of BW's motion.

issue upon which its ruling on Fry's third motion was based. This satisfied the concerns of fairness raised in *Le Francois* and no purpose would have been served by soliciting additional briefing on the issue.

Under the above circumstances, we conclude the trial court did not err.

## VII. The Trial Court's Summary Adjudication of BW's Contract Causes of Action Was Correct

### A. *General Appellate and Summary Judgment Principles*

" 'A party is entitled to summary adjudication of a cause of action if there is no triable issue of material fact and the party is entitled to judgment as a matter of law.' " (*Cornell v. Berkeley Tennis Club* (2017) 18 Cal.App.5th 908, 924; § 437c, subds. (c), (f).)

" 'A summary adjudication motion is subject to the same rules and procedures as a summary judgment motion. Both are reviewed de novo.' " (*Rodriguez v. E.M.E., Inc.* (2016) 246 Cal.App.4th 1027, 1032 (*Rodriguez*).) " 'On appeal after a motion for summary judgment [or summary adjudication] has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained.' " (*Smith v. Wells Fargo Bank, N.A.* (2005) 135 Cal.App.4th 1463, 1472.) Here, the trial court did not rule on any of the parties' objections. Accordingly, we presume them to have been overruled. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534; *Rodriguez*, at p. 1032.)

" ' "We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." ' " (*Schofield v. Superior Court* (2010) 190 Cal.App.4th 154, 156–157.) However, " '[w]e are not bound by the trial court's reasons for granting summary judgment [or summary adjudication] because we review the trial court's ruling, and not its rationale.' " (*Brown v. El Dorado Union High School Dist.* (2022) 76 Cal.App.5th 1003, 1022–1023 (*Brown*).)

In addition, "our review is governed by a fundamental principle of appellate procedure, namely, that ' "[a] judgment or order of the lower court is presumed correct," ' and thus, ' "error must be affirmatively shown." ' [Citations.] Under this principle, [an] appellant bears the burden of establishing error on appeal, even though [the respondent] had the burden of proving its right to summary [adjudication] before the trial court." (*Rodriguez, supra*, 246 Cal.App.4th at p. 1033.)

### B.     Analysis

Although the trial court summarily adjudicated BW's contract causes of action on a different theory, we believe the disposition is best analyzed under the original theory espoused by Fry in its third motion. As mentioned, an appellate court is not bound by a trial court's rationale in summarily adjudicating the contract causes of action. (*Brown, supra*, 76 Cal.App.5th at pp. 1022–1023.)

Notably, BW did not address the actual premise of Fry's third motion (i.e., waiver), either in its opening brief or its reply brief, despite the fact that Fry reasserted the waiver argument in their respondents' brief.[15] Instead, BW focused solely on attacking the trial court's stated rationale for its ruling—that provisions of the Fry/Calcot lease contain no express requirement Fry remove the plastic once its tenancy has been terminated.

" 'Waiver refers to the act, or the consequences of the act, of one side. Waiver is the intentional relinquishment of a known right after full knowledge of the facts and depends upon the intention of one party only. Waiver does not require any act or conduct by the other party.' [Citation.] Thus, '[t]he *pivotal* issue in a claim of waiver is the intention of the party who allegedly relinquished the known legal right.' " *Old Republic Ins. Co. v. FSR Brokerage, Inc.* (2000) 80 Cal.App.4th 666, 678 (*Old Republic*).)

---

[15] The parties did, however, address the waiver issues in their briefs in support of, and opposition to, Fry's third motion.

32.

" 'California courts will find waiver when a party intentionally relinquishes a right or when that party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished.' " (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 33–34 (*Waller*).)

" 'The burden … is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and "doubtful cases will be decided against a waiver." ' " (*Waller*, *supra*, 11 Cal.4th at p. 31.) A "trial court may properly resolve an issue of waiver as a question of law when the underlying facts are undisputed." (*Old Republic*, *supra*, 80 Cal.App.4th at p. 679.)

The evidence submitted in connection with Fry's third motion established by clear and convincing evidence that Calcot did, indeed, waive any contractual right to require Fry to remove the plastic. The evidence established the Benhong/Calcot LOI contemplated Benhong would purchase the Fry plastic as a *condition precedent* to the purchase and sale of the 11 acres, which included five subject warehouses, and that Benhong would lease the remaining three subject warehouses. Consistent with the LOI, the Benhong/Calcot PSA included conditions precedent that Benhong *first* purchase the plastic and sign a lease for the remaining three subject warehouses before Calcot would be obligated to sell.[16]

After the UD judgment was obtained, Calcot did not try to remove Fry from the property because Calcot had entered into the Benhong/Calcot LOI and believed Benhong would be purchasing the plastic.

Neeper testified at deposition that Calcot understood Benhong intended to continue storing plastic in the subject warehouses pending completion of the

---

[16] Although the referenced Lease was not attached to the copy of the Benhong/Calcot PSA submitted in connection with Fry's third motion for summary adjudication, it was entered into evidence during trial on BW's trespass and nuisance causes of action.

33.

Benhong/Calcot PSA. He testified, "The intent was that [Benhong] was going to purchase the [11] acres and put his processing equipment … on those [11] acres, and then work through those warehouses' worth of plastic. Those three warehouses that were subject to rent, he probably would have tried to get to and empty those out as quickly as possible and then deal with the warehouses on the [11 acres]." When asked, "So to your knowledge, the intent was those [remaining three subject warehouses] would be leased; and at some point, the lease would terminate and Calcot would remain the owner of [them][,]" Neeper responded, "Yes."

On January 7, 2016, approximately one week after the Benhong/Calcot PSA was signed, Benhong completed the purchase of the plastic. Shortly thereafter, Calcot's attorney advised Richardson that Calcot wanted rental payments to continue and inquired as to the status of the plastic sale. Richardson responded that the sale was completed, that Benhong now owned the plastic, and that Benhong was sending Fry the January rent which Fry would then forward to Calcot. Richardson indicated Benhong would be making future rent payments to Calcot directly. Calcot's attorney voiced no objection and advised Richardson that the sale of the 11 acres was scheduled to close escrow in mid-May and that Benhong would be leasing the three warehouses that were not being sold in order to remove the plastic stored therein. Calcot's attorney indicated "[t]he damage to the [subject] warehouses caused by [Fry] remains an open issue, especially with respect to the three warehouses that Calcot will continue to own. We will get back to you regarding the cost of repair work since the extent of damage cannot be fully identified until the [plastic] is removed."

Importantly, BW acknowledged in its opposition brief to Fry's third motion that "… Calcot *did accept payment of a month's rent from Benhong* …." (Italics added.) Similarly, in response to a request for admission in which BW was asked to admit Benhong had been in possession of the subject property since in or around January 2016, BW responded: "Deny. Benhong was in possession of the Property for a short period but

has not continued its *tenancy*." (Italics added.) "A tenancy may be created without a formal agreement, by consent and acceptance of rent." (*Getz v. City of West Hollywood* (1991) 233 Cal.App.3d 625, 629.)

Thus, the evidence submitted in connection with Fry's third motion points in only one direction—Calcot intended and required that Benhong purchase the plastic before any sale of the 11 acres; Benhong did so; Calcot intended that the plastic would remain on-site in anticipation of that sale; Calcot intended Benhong would be its tenant (at least with respect to three subject warehouses); the Fry/Calcot lease was terminated by virtue of the UD judgment; thereafter, Calcot accepted rent from Benhong in anticipation of the sale of the 11 acres; thereafter, Calcot never sought rent from Fry; and BW has admitted a Benhong tenancy was created. Calcot's conduct was entirely inconsistent with any intent that it preserve a right to enforce an obligation on Fry's part to remove the plastic. We conclude there are no triable issues of material fact and that, based on clear and convincing evidence, Fry was entitled to summary adjudication of BW's contract causes of action as a matter of law on grounds of waiver.[17]

## C. Alternative Harmless Error Determination

The California Constitution generally prohibits a court from setting aside a judgment based on procedural error unless the court is "of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13; see also § 475 ["… No judgment, decision, or decree shall be reversed or affected by reason of any error, ruling, instruction, or defect, unless it shall appear from the record that such error, ruling, instruction, or defect was prejudicial…."])

---

[17] Because we uphold summary adjudication of BW's contract causes of action on the theory of waiver, we need not address BW's contention that, under Civil Code section 1951.2 and the holding of *Walt v. Superior Court* (1992) 8 Cal.App.4th 1667, 1678, a tenant's obligations "do not terminate after the lease is forfeited."

" '[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citation.] ' "[P]robability" in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*.' " (*Cassim*, *supra*, 33 Cal.4th at p. 800.) Moreover, prejudice is not presumed and it is the appellant's burden to establish prejudice. (§ 475; *Cassim*, *supra*, 33 Cal.4th at pp. 801–802.) In determining whether an error is prejudicial, we look at the entire record. (*Cassim*, at pp. 801–802.)

Fry argues that, if this court determines the trial court erred in granting summary adjudication of BW's contract causes of action, we should deem the error harmless because a disposition in favor of BW on those causes of action would be inconsistent with the jury's findings. We have considered the jury's verdict as well as the remainder of the record on appeal and agree that any alleged error would be harmless.

Here, there is no reasonable probability BW would obtain a more favorable outcome in the absence of any supposed error. The jury found Calcot gave Fry permission to keep the plastic on the subject property during the duration of Fry's ownership of the plastic and that after Benhong obtained ownership of the plastic Calcot gave Benhong permission to keep the plastic on its property. This coupled with the facts established in connection with Fry's third motion for summary adjudication and the remainder of the record on appeal demonstrate BW would not have had a reasonable chance at a more favorable outcome had summary adjudication of the contract causes of action not been granted.

**DISPOSITION**

The judgment in favor of Thomas H. Fry and Ruth M. Fry, as Trustees of the T&R Fry Family Trust and against Big Washington LLC is affirmed in its entirety. The Frys are entitled to their costs on appeal. (Cal. Rules of Court, rule 8.278(a).)


                                                                SNAUFFER, J.

WE CONCUR:


LEVY, Acting P. J.


PEÑA, J.